**UNITED STATES DISTRIC COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE:** | |
| **FOSAMAX PRODUCTS LIABILITY LITIGATION** | |
| | |
| *This Document Relates To:* | |
| | |
| **MARY KAMIENSKI,** | |
| | |
| Plaintiff, | CIVIL ACTION NO: |
| | |
| vs. | JURY DEMANDED |
| | |
| | |
| **MERCK SHARP & DOHME, CORP.,** | |
| **No. 1, that entity which originally obtained** | |
| **permission from the U.S. Food and Drug** | |
| **Administration to market bisphosphonate;** | |
| **No. 2, that entity which obtained** | |
| **permission from the FDA to market the** | |
| **bisphosphonate ingested by Shirley Venus** | |
| **Shannon; No. 3, that entity which originally** | |
| **manufactured and sold any bisphosphonate drug** | |
| **which was ultimately ingested by Plaintiff;** | |
| **No. 4, that entity which originally manufactured** | |
| **and sold any bisphosphonate, which was ultimately** | |
| **ingested by Plaintiff; No. 5, that entity which** | |
| **marketed brand or generic bisphosphonate which** | |
| **was ultimately consumed by the Plaintiff.** | |
| | |
| Defendants. | |

**COMPLAINT**

COMES NOW Plaintiff, MARY KAMIENSKI, and for causes of action against

MERCK, SHARP & DOHME, CORP., formerly known as Merck & Co., Inc., (hereinafter

"Defendant" and/or "Merck"), and factious Defendants nos. 1 through 5, alleges as follows:

Page **1** of **30**

## I. <u>INTRODUCTION</u>

1.      This an action for personal injury, statutory, compensatory, and punitive damages due to Plaintiff as a result of Defendants' concealment of risks associated with their drugs FOSAMAX as well as their gross exaggeration of the purported fracture reduction benefits conferred by the drug FOSAMAX, and Defendants over promotion of the drugs for non-approved, or "off-label," indications.

## II. <u>JURISDICTION AND VENUE</u>

2.      This Court has jurisdiction pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and Defendant.  Plaintiff is a resident of the State of Connecticut, and Defendant Merck is incorporated and has as its primary business in the State of New Jersey. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

## III. <u>PARTIES</u>

3.      Plaintiff MARY KAMIENSKI was born on November 3, 1935. At all relevant times, Plaintiff was a citizen of Glastonbury, Connecticut.  Plaintiff used FOSAMAX from at least 2000  until approximately 2010.

4.      MERCK is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in New Jersey. The Defendant's principal office is located at One Merck Drive, Whitehouse Station, New Jersey, 08889.

5.      The true names and capacities of those Defendants designated as Entities no. 1 through 5, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sues said Defendants by such fictitious names and will ask leave of Court to amend this Complaint to show their true names or capacities when the same have been ascertained.  Plaintiff is informed and believes, and thereon alleges, that each of the said entities proximately caused injury and damages to the Plaintiff as alleged herein.

6.      Defendant Merck was at all relevant times authorized to and regularly conducted business in the State of New Jersey and continues to do so.

7.      At all relevant times Defendant Merck, through its agents, servants, employees and apparent agents was the designer, manufacturer, labeler, promoter, marketer, distributor and seller of FOSAMAX, a bisphosphonate drug used primarily to prevent, mitigate or reverse the effects of osteoporosis and Paget's Disease.

8.      Defendant Merck, either directly or through its agents, apparent agents, servants or employees, at all relevant times, distributed and sold FOSAMAX in the State of New Jersey. Defendant Merck derives substantial revenue from pharmaceutical products used or consumed in the State of New Jersey.

9.      Defendant Merck expected, or should have expected, that its business activities could or would have consequences within the State of New Jersey.

10.     Defendant Merck placed FOSAMAX into the stream of worldwide commerce and interstate commerce in the United States. It did so without adequate testing and with no warning that the drug carried with it a risk of causing severely suppressed bone turnover and other related injuries such as susceptibility to fractures and/or fractures after long term use. It

also did so without adequate instructions regarding the appropriate duration of use for FOSAMAX.

## IV. SUMMARY OF THE CASE

11.    Defendant Merck, directly or through its agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed and sold FOSAMAX for the treatment and prevention of osteoporosis, Paget's Disease, and other uses.

12.    As a result of the defective nature of bisphosphonates including but not limited to FOSAMAX, persons who were prescribed and ingested these products for several years, including Plaintiff MARY KAMIENSKI, have suffered and may continue to suffer severe and permanent personal injuries, including osteonecrosis of the jaw (ONJ), weakened or brittle bones, multiple stress fractures, and low energy long bone fractures as a result of severely suppressed bone turnover caused by the long term use of bisphosphonates.

13.    Defendants concealed and continue to conceal their knowledge of bisphosphonates' lack of long-term benefit and unreasonably dangerous risks from Plaintiff MARY KAMIENSKI, her physicians, other consumers, and the medical community. Specifically, Defendants have yet to adequately inform consumers and the prescribing medical community about the well established risks of long-term bisphosphonate use including severely suppressed bone turnover and low energy long bone fractures.

14.    Defendant Merck failed to conduct adequate and sufficient post-marketing surveillance of FOSAMAX after it began marketing, advertising, distributing, and selling the drug.

15.    As a result of Defendants' actions and inaction, Plaintiff MARY KAMIENSKI was

injured due to her ingestion of the bisphosphonate FOSAMAX, which have caused and will continue to cause Plaintiff's various injuries and damages. Plaintiff accordingly seeks compensatory damages, statutory damages, and punitive damages.

## V. FACTUAL BACKGROUND

16.     At all relevant times Defendant Merck was responsible for, or involved in, designing, manufacturing, marketing, advertising, distributing, and selling FOSAMAX.

17.     In September 1995, the United States Food and Drug Administration ("FDA") approved Merck's compound alendronate for various uses, including the treatment of osteoporosis and Paget's Disease. Alendronate is marketed by Defendant Merck as FOSAMAX.

18.     Fosamax is a brand pharmaceutical medication.

19.     FOSAMAX falls within a class of drugs known as bisphosphonates. Bisphosphonates are used for treating bone conditions such as osteoporosis and Paget's disease. Other drugs within this class, such as Aredia and Zometa, are used as chemotherapy and as adjunct chemotherapy but are not indicated for use in noncancerous conditions such as osteoporosis. There are two classes of bisphosphonates: the N-containing (nitrogenous) and non-N-containing (non-nitrogenous) bisphosphonates.  The nitrogenous bisphosphonates include the following: pamidronate (Aredia); ibandronate (BONIVA); alendronate (FOSAMAX) and risedronate (ACTONEL). The PDRs for FOSAMAX confirm that the respective molecules contain a nitrogen atom. The non-nitrogenous bisphosphonates include the following: etridonate (Didronel); clodronate (Bonefos and Loron); and tiludronate (Skelid). These

compounds do not contain a nitrogen atom.

20.      FOSAMAX works by inhibiting bone resorption and suppressing bone turnover. Bone mineralization occurs in two phases. Primary mineralization occurs while new bone is forming.  Because FOSAMAX severely suppress bone turnover when used for several years, bone remodeling and primary mineralization are inhibited. Secondary mineralization of existing bone however, continues to occur. This results in an increase in the tissue mineral content of the bone which translates to an increase in bone mineral density (BMD). Increased BMD does not necessarily correspond with reduction of fracture risk. Additionally, through the bisphosphonate mechanism of action, bone becomes highly mineralized, homogenous, brittle, and more susceptible to fracture.

21.      Prior to the introduction of FOSAMAX, the diagnosis of osteoporosis included clinical criteria such as prior bone fracture. With the advent of BMD-based diagnosis for osteoporosis in the 1990's, the number of women diagnosed with osteoporosis skyrocketed. The BMD diagnostic criteria for osteoporosis has not been proven to correspond to those women who are most at risk for fracture.

22.      Due to the widespread overprescription of anti-osteoporosis medications, including FOSAMAX, the World Health Organization questioned the prudence of the using the arbitrary standard-deviation system for the BMD-based diagnosis and treatment of osteoporosis.  As a result, it has recently developed and advocated a new tool to assess fracture risk and the need for treatment called FRAX.  The FRAX assessment tool takes into account factors other than just BMD in determining whether a patient is at risk for suffering an osteoporotic fracture and could benefit from medication.

23.    As medical researchers have concluded: "The use of surrogate endpoints such as BMD to predict fracture reduction risk should be approached with caution, as the relationship between BMD changes and fracture risk reduction with antiresorptive therapies [such as FOSAMAX] is uncertain." Marcus, R., et al., *Anti-Resorptive Treatment of Post-Menopausal Osteoporosis: Comparison of Study Designs and Outcomes in Large Clinical Trials with Fracture as an Endpoint,* 23 Endocrine Rvws. 16-37 (2002).

24.    Numerous studies have confirmed that the effects of FOSAMAX on bone continue for years after treatment is discontinued. One study showed that bone turnover was still inhibited by more than 50% 5 years after the discontinuation of FOSAMAX therapy. Strewler, G., *Decimal Point- Osteoporosis at the 10-Year Mark,* 350 N. Engl. J. Med. 1172 (2004). Merck's own studies reveal that FOSAMAX has a half-life in bone of greater than ten years.

25.    Defendant Merck knew or should have known that by inhibiting bone turnover while at the same time allowing the secondary mineralization of old bone to continue, long term FOSAMAX therapy would result in bones becoming highly mineralized, brittle and more susceptible to fracture. This is especially true given the fact that the effects of FOSAMAX on the bone accumulate and continue for years after treatment is discontinued.

26.    Defendant Merck promoted FOSAMAX as an effective treatment for osteoporosis that significantly reduced the risk of fracture in post-menopausal women.

27.    Defendant Merck's 1997 Fracture Intervention Trial (FIT) reported a 47% reduction in the risk of new vertebral fractures and a 28% reduction in the risk of clinical fractures in postmenopausal women taking alendronate compared to those taking a placebo. Ensrud, et

al., *Treatment with Alendronate Prevents Fractures in Women with Highest Risk, 157* Arch. of Int. Med. 2617 (Dec. 8/22,1997).

28.    Medical researchers in the January 19, 2008, issue of the *British Medical Journal* revealed the manner in which bisphosphonates such as FOSAMAX are presented reducing fracture risk for those women who actually have osteoporosis tends to exaggerate the actual fracture-reduction benefit conferred. According to the authors, published clinical trials exaggerated the fracture-reduction benefits through the use of relative risk rather than absolute risk. As the authors state: "Impressive sounding reductions in relative risk can mask much smaller reductions in absolute risk." By using the math of "relative risk" rather than "absolute risk", the purported benefits of the drugs appear larger than they actually are in the general population. As a result, billions of dollars are being spent on drugs that have questionable utility for the ultimate goal of fracture reduction.

29.    Correspondingly, when examined in a clinical setting, later observational studies revealed that the FIT study exaggerated the benefit derived from alendronate therapy in reducing the risk of fracture. The 2006 ICARO study concluded that the incidence of fractures during treatment with antiresorptive agents, including FOSAMAX, in a clinical setting is considerably higher than that observed in randomized clinical trials, especially when therapy was not supplemented with calcium and vitamin D. Silvano, et al., *Fracture Incidence and Characterization in Patients on Osteoporosis Treatment: The ICARO Study, 21* J. Bone and Mineral Research 1565 (2006).

30.    Long term studies of the effects of FOSAMAX therapy revealed that the benefits of remaining on FOSAMAX for longer than 5 years were limited. One study, known as the

FLEX study, concluded that while women who discontinued FOSAMAX after 5 years of therapy experienced a moderate decline in BMD, their BMD remained above baseline and they did not experience a significant increase in the number of actual fractures when compared to women who continued FOSAMAX therapy for more than 5 years. Black, et al., *Effects of Continuing or Stopping Alendronate After 5 Years of Treatment,* 296 JAMA 2927 (2006). The results of this study suggested that continuing FOSAMAX therapy for more than 5 years likely does not benefit the majority of women taking the drug. It was also observed in this study that during the later years of the study, the non-vertebral fracture rate of women on alendronate appeared to be the same or higher than during the first three years of alendronate therapy, despite higher bone mineral density levels.

31.     Defendants have been aware of sound scientific and medical evidence that safer alternative therapies, such as vitamin D and calcium supplements, effectively reduce the risk of non-vertebral fractures without the harmful side effects that can result from long-term bisphosphonate use. For example, results of a three year study of the effect of calcium and vitamin D supplementation on bone density showed that women taking calcium and vitamin D supplements had significantly less total body bone loss and substantially fewer fractures compared to women in the placebo group. Hughes, et al., *Effects of Calcium and Vitamin D Supplementation on Bone Density in Men and Women 65 Years of Age or Older,* 337 N. Engl. J. Med. 670 (1997). The percentage of fracture reduction closely follows those presented in Defendants' studies.

32.     Despite evidence of the positive effects of vitamin D and calcium on bone health and fracture risk, along with evidence of reduced efficacy of FOSAMAX when not supplemented

with vitamin D and calcium, Defendants have never done a head-to-head comparative study of treatment with FOSAMAX alone versus treatment with vitamin D and calcium alone.

Rather than evaluating and verifying the safety of long-term FOSAMAX use with respect to bone strength and stress fractures, Defendant Merck proposed further uses of FOSAMAX, such as FOSAMAX-D, and sought to extend the exclusivity period on the patent for FOSAMAX through 2018.

33.    Over the last few years, there have been an increasing number of reports of patients suffering multiple stress fractures and low energy long bone fractures as a result of severely suppressed bone turnover caused by from long-term bisphosphonate use. Severely suppressed bone turnover from long-term bisphosphonate use has been well recognized in recent medical literature.

34.    There is also evidence from at least one animal study that the severe suppression of bone turnover and bone remodeling that occurs with alendronate therapy, can result in the accumulation of microdamage in bone as well as a reduction in some of the biomechanical properties of bone. Mashiba, et al., *Suppressed Bone Turnover by Bisphosphonates Increases Microdamage Accumulation and Reduces Some Biomechanical Properties in Dog Rib*, 15 J. Bone and Mineral Research 613 (2000). These findings were further reflected in human studies: "Our findings raise the possibility that severe suppression of bone turnover may develop during long-term alendronate therapy, resulting in increased susceptibility to, and delayed healing of, nonspinal fractures." Odvina, Clarita V., et al., *Severely Suppressed Bone Turnover: A Potential Complication of Alendronate Therapy,* 90 J. Clin. Endocrinol. Metab. 1294-1301 (2005).

35.    January 7, 2008, the FDA issued a medical advisory warning doctors and bisphosphanate patients, including those on FOSAMAX, of the "possibility of severe and sometimes incapacitating bone, joint, and/or muscle pain," and advising physicians to discontinue prescribing FOSAMAX if such complaints occurred during therapy. One week later, an article in the January 15, 2008 issue of the *Journal of Rheumatology* concluded that FOSAMAX patients have a 287% higher chance of developing osteonecrosis (jaw, hip, and knee) than those not taking the drug.

36.    Despite their knowledge of the dangerous side effects that can result from long-term bisphosphonate use, Defendants refuse to warn patients, physicians and the medical community about the risk of severely suppressed bone turnover. Defendants continue to defend FOSAMAX, mislead physicians and the public, and minimize unfavorable findings. Until it went off patent in 2008, FOSAMAX was one of Defendant Merck's top selling drugs, averaging more than $3 billion a year in sales.

37.    Consumers, including Plaintiff MARY KAMIENSKI, who have used FOSAMAX for the treatment or prevention of osteoporosis, have several alternative safer products available to them and have not been adequately warned about the significant risks and lack of benefits associated with long-term bisphosphonate therapy.

38.    Defendants knew of the significant risk of severely suppressed bone turnover, brittle bones, multiple stress fractures and low energy long bone fractures that could result from long-term bisphosphonate use, but Defendants did not adequately and sufficiently warn or instruct consumers, including Plaintiff MARY KAMIENSKI, her physician or the medical community, of such risks.

39.     As a direct result, Plaintiff  MARY KAMIENSKI was prescribed FOSAMAX from approximately 2000 to approximately 2010 for the treatment and/or prevention of osteoporosis or osteopenia, and has been permanently and severely injured, having suffered serious consequences from long-term bisphosphonate use. Plaintiff MARY KAMIENSKI requires and will in the future require ongoing medical care and treatment as a result of her injuries.

40.     Plaintiff MARY KAMIENSKI has suffered from mental anguish from the knowledge that Plaintiff may have life-long complications as a result of the injuries Plaintiff sustained from the use of FOSAMAX.

41.     Plaintiff used FOSAMAX as prescribed and in a foreseeable manner consistently for the treatment and/or prevention of osteoporosis or osteopenia.

42.     As a direct and proximate result of her long-term bisphosphonate use, Plaintiff suffered severely suppressed bone turnover and sustained a severe femur fracture as a result.

43.     Plaintiff, as a direct and proximate result of long-term bisphosphonate use, suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress.

44.     Plaintiff used FOSAMAX which had been provided to her in a condition that was substantially the same as the condition in which they were manufactured and sold.

45.     Plaintiff would not have used and her physician would never have prescribed FOSAMAX  for so many years had Defendants properly disclosed the risks associated with the long-term use of bisphosphonates.

46.     Defendants, through their affirmative misrepresentations and omissions, actively

concealed from Plaintiff and her physicians the true and significant risks associated with long-term bisphosphonate use. The running of any applicable statute of limitations has been tolled by reason of Defendants' fraudulent concealment.

47.     As a result of Defendants actions, Plaintiff and her prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this complaint, and that those risks were the direct and proximate result of Defendants' acts, omissions, and misrepresentations.

## VI. <u>COUNTS</u>

### COUNT I
### STRICT LIABILITY - DEFECTIVE DESIGN

48.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

49.     Defendant Merck researched, designed, developed, manufactured, labeled, marketed, promoted, supplied, distributed and/or sold the drug FOSAMAX in a manner that was defective and unreasonably dangerous, to consumers.

50.     Defendant Merck expected FOSAMAX to reach and it did reach consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by  Defendant Merck.

51.     Plaintiff used FOSAMAX as prescribed and in a manner normally intended, recommended, promoted, and marketed by Merck.

52.     FOSAMAX failed to perform safely when used as instructed or in a reasonably foreseeable manner by ordinary consumers, including Plaintiff.

53.    FOSAMAX was defective in its design or formulation and was unreasonably dangerous in that its foreseeable risks exceeded the benefits associated with its design or formulation. FOSAMAX is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other osteoporosis treatments on the market and is more dangerous than ordinary consumers or their physicians can reasonably foresee or anticipate.

54.    Alternatively, FOSAMAX was defective in design and was unreasonably dangerous in that its label failed to warn physicians and patients of the dangers associated with long-term use of bisphosphonates, including, but not limited to the risk of osteonecrosis of the jaw, severely suppressed bone turnover, brittle bones and a greater susceptibility to stress fractures or low energy  fractures; and the label failed to instruct physicians and patients about the limited length of time FOSAMAX was actually effective in preventing fractures.

55.    Although Defendant Merck knew, or should have known, of the defective nature of FOSAMAX, it continued to design, manufacture, label, market and sell FOSAMAX so as to maximize sales and profits at the expense of the public health and safety.  By so acting, Defendant Merck acted with knowing, conscious and deliberate disregard of the foreseeable harm caused by FOSAMAX.

56.    Plaintiff nor her prescribing physician could have, through the exercise of reasonable care, discovered FOSAMAX'S defects or perceived the dangers posed by FOSAMAX.

57.    As a direct and proximate result of Merck's failure to adequately warn and instruct physicians and patients or other acts, omissions and/or misrepresentations of Merck described herein, Plaintiff developed severe and permanent injuries, including severely suppressed bone

turnover and a severe femur fracture, pain and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions, including, but not limited to jawbone necrosis, infections, and fractures resulting from severely suppressed bone turnover caused by long-term bisphosphonate use.

58.    Defendant Merck's aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life, and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant Merck and deter it from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendant Merck for any and all damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, as well as punitive damages, together with interest, cost of suit and counsel fees.

## COUNT II
## STRICT LIABILITY-FAILURE TO WARN

59.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

60.    Defendant Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce the drug, FOSAMAX, and in the course of the same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a

duty to warn of the risks associated with the use of FOSAMAX.

61.    FOSAMAX was under the exclusive control of Merck and was unaccompanied by appropriate instructions and warnings regarding the risk of osteonecrosis of the jaw, severely suppressed bone turnover, resulting stress fractures, or low energy long bone fractures and other severe and permanent injuries associated with its use. The instructions and warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians. The promotional activities of Merck further diluted or minimized the warnings given with the product.

62.    Defendant Merck downplayed the serious and dangerous side effects of FOSAMAX to encourage sales of the product; consequently, Defendant Merck placed its profits above its customers' safety.

63.    FOSAMAX was defective and unreasonably dangerous when it left the possession of Defendant Merck in that it contained instructions and warnings insufficient to alert Plaintiff or her physicians to the dangerous risks and reactions associated with its long-term use, including, but not limited to severely osteonecrosis of the jaw, suppressed bone turnover, multiple stress fractures, and low energy long bone fractures associated with long-term use. Even though Defendant Merck knew or should have known of the risks and reactions associated with FOSAMAX, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

64.    Plaintiff used FOSAMAX as instructed and in a reasonably foreseeable manner.

65.    Plaintiff could not have discovered any defect in FOSAMAX through the exercise of reasonable care.

66.     Defendant Merck, as a manufacturer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field and, further, Defendant had knowledge of the dangerous risks and side effects of FOSAMAX.

67.     Plaintiff did not have the same knowledge as Defendant Merck and no adequate warning was communicated to her or her physician(s).

68.     Defendant Merck had a continuing duty to warn consumers, including Plaintiff and her physician(s), and the medical community of the dangers associated with FOSAMAX, and by negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Merck breached its duty.

69.     Although Defendant Merck knew, or was reckless in not knowing, of the defective nature of FOSAMAX, it continued to design, manufacture, label, distribute, market, promote and sell FOSAMAX without providing adequate warnings and instructions concerning the use of FOSAMAX so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by FOSAMAX.

70.     As a direct and proximate result of Defendant Merck's failure to adequately warn and instruct physicians and patients or other acts, omissions and/or misrepresentations of Merck described herein, Plaintiff developed severe and permanent injuries, including severely suppressed bone turnover and a severe femur fracture, pain and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions, including, but not limited to jawbone necrosis, infections, and fractures resulting from severely suppressed bone turnover caused by long-term bisphosphonate use.

71.     In addition, Defendant Merck's conduct in the packaging, warning, marketing, advertising, promotion, distribution, and sale of FOSAMAX was committed with knowing, conscious, willful, wanton, and deliberate disregard for the value of human life, and the rights and safety of consumers such as Plaintiff.

WHEREFORE, Plaintiff demands judgment against Merck for any and all damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, together with interest, cost of suit and counsel fees.

## COUNT III
## NEGLIGENCE

72.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

73.     Defendant Merck owed Plaintiff, MARY KAMIENSKI, and other consumers, a duty to exercise reasonable care when researching, designing, developing, testing, manufacturing, labeling, marketing, advertising, distributing and selling FOSAMAX.

74.     Merck failed to exercise due care under the circumstances and therefore breached this duty by:

a)      failing to properly and thoroughly test FOSAMAX before releasing the drug to market;

b)      failing to properly and thoroughly analyze the data resulting from the pre-marketing tests of FOSAMAX;

c) failing to conduct sufficient post-market testing and surveillance of FOSAMAX;

d) designing, manufacturing, labeling, marketing, advertising, distributing, and selling FOSAMAX to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of FOSAMAX and without proper instructions to avoid the harm which could foreseeably occur as a result of using the drug;

e) failing to exercise due care when advertising and promoting FOSAMAX; and

f) negligently continuing to manufacture, label, market, advertise, distribute and sell FOSAMAX without appropriate warnings and instructions after Merck knew or should have known of its adverse effects.

75. Defendant Merck knew or should have known that consumers, including the Plaintiff, would foreseeably suffer injury as a result of the Defendant's failure to exercise reasonable care.

76. As a direct and proximate consequence of Defendant Merck's failure to adequately warn or other acts, omissions and/or misrepresentations described herein, Plaintiff developed severe and permanent injuries, including severely suppressed bone turnover and a severe femur fracture, pain and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions, including, but not limited to jawbone necrosis, infections, and fractures resulting from severely suppressed bone turnover caused by long-term bisphosphonate use.

77. Defendant Merck's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights

and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages in accordance with the laws of the State of Connecticut so as to punish Defendant and deter it from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendant Merck for any and all damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, as well as punitive damages, together with interest, cost of suit and counsel fees.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

78.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

79.    Defendant Merck expressly represented to Plaintiff MARY KAMIENSKI, her physician, other consumers and the medical community that FOSAMAX was safe and fit for its intended purposes, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested.

80.    Defendant Merck marketed FOSAMAX as being effective for the treatment and prevention of osteoporosis and the prevention of fractures in women with osteoporosis or osteopenia.

81.    FOSAMAX does not conform to Defendant Merck's express representations because it is not safe, has numerous and serious side effects, and causes severe and permanent injuries,

including, but not limited to osteonecrosis of the jaw, severely suppressed bone turnover, brittle bones and low energy long bone fractures.

82.     At all relevant times FOSAMAX did not perform as safely as an ordinary consumer would expect, when used as instructed and in a reasonably foreseeable manner.

83.     Plaintiff MARY KAMIENSKI, her physician, other consumers, and the medical community relied upon Defendant Merck's express warranties.

84.     As a direct and proximate consequence of Defendant Merck's actions, omissions, and misrepresentations, Plaintiff developed severe and permanent injuries, including severely suppressed bone turnover and a severe femur fracture, pain and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions, including, but not limited to jawbone necrosis, infections, and fractures resulting from severely suppressed bone turnover caused by long-term bisphosphonate use.

85.     Defendant Merck's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendant Merck for any and all damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, as well as punitive damages, together with interest, cost of suit and counsel fees.

## COUNT V
## BREACH OF IMPLIED WARRANTY

86.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

87.     Defendants Merck designed, developed, manufactured, labeled, distributed, advertised and sold FOSAMAX.

88.     At all relevant times, Defendant Merck knew of the use for which FOSAMAX was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

89.     Defendant Merck was aware that consumers, including Plaintiff MARY KAMIENSKI, would use FOSAMAX for treatment and prevention of osteoporosis and for the prevention of fractures.

90.     Plaintiff, her physician, and the medical community reasonably relied upon the judgment and sensibility of Defendant Merck to sell FOSAMAX only if it was indeed of merchantable quality and safe and fit for its intended use.

91.     Defendant Merck breached its implied warranty to consumers, including Plaintiff; FOSAMAX was not of merchantable quality or safe and fit for its intended use. Consumers, including Plaintiff, her physician and the medical community, reasonably relied upon Defendant Merck's implied warranty for FOSAMAX.

92.     FOSAMAX reached consumers without substantial change in the condition in which it was manufactured and sold by Defendant Merck.

93.     As a direct and proximate consequence of Defendant Merck's actions, omissions, and

misrepresentations, Plaintiff developed severe and permanent injuries, including severely suppressed bone turnover and a severe femur fracture, pain and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions, including, but not limited to jawbone necrosis, infections, and fractures resulting from severely suppressed bone turnover caused by long-term bisphosphonate use.

94.     Defendant Merck's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant Merck and deter it from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendant Merck for any and all damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, as well as punitive damages, together with interest, cost of suit and counsel fees.

## COUNT VI
## FRAUDULENT MISREPRESENTATION

95.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

96.     Defendant Merck made fraudulent misrepresentations with respect to FOSAMAX in the following particulars:

a)  Defendant Merck represented through its labeling, advertising, marketing materials,

detail persons, seminar presentations, publications, notice letters, and regulatory submissions that FOSAMAX had been tested and found to be safe and effective for the treatment and prevention of osteoporosis and Paget's disease;

b) Defendant Merck represented that FOSAMAX was safer than other alternative medications;

c) Defendant Merck represented that FOSAMAX was a pill which would prevent rather than induce osteoporotic fractures.

d) Defendant Merck represented that FOSAMAX was effective in preventing fractures in osteoporotic and osteopenic women and could be used safely for up to ten years;

e) Defendant Merck specifically denied that long-term use of FOSAMAX could lead to severely suppressed bone turnover and increase the risk of stress fractures and low energy long bone fractures.

97.    Defendant Merck knew that its representations were false, yet it willfully, wantonly, grossly and recklessly disregarded its obligation to provide truthful representations regarding the safety and risk of FOSAMAX use to consumers, including Plaintiff, her physician and the medical community.

98.    The representations were made by Defendant Merck with the intent that doctors and patients, including Plaintiff and her physician, rely upon them.

99.    Defendant Merck's representations were made with the intent of defrauding and deceiving Plaintiff, her physician, other consumers, and the medical community to induce and encourage the sale of FOSAMAX.

100.    Plaintiff, her physicians and others reasonably relied upon the representations.

101.    Defendant Merck's fraudulent representations evinced its callous, wanton, willful, reckless and/or depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

102.    As a direct and proximate consequence of Defendant Merck's actions, omissions, and misrepresentations, Plaintiff developed severe and permanent injuries, including severely suppressed bone turnover and a severe femur fracture, pain and mental anguish, including diminished enjoyment of life, and fear of developing other harmful conditions, including, but not limited to jawbone necrosis, infections, and fractures resulting from severely suppressed bone turnover caused by long-term bisphosphonate use.

103.    Defendant Merck's conduct as described above was committed with knowing, conscious, wanton, willful, gross and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant Merck and deter them from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendant Merck for any and all damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, as well as punitive damages, together with interest, cost of suit and counsel fees.

## COUNT VII[1]
## PUNITIVE DAMAGES

104.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in this

---

1 Plaintiff reserves the right to amend Complaint to add punitive damage claims against John Doe Defendants after further discovery.

Complaint with the same force and effect as if fully set forth herein.

105. Defendant Merck has been repeatedly admonished by the FDA about the manner in which it has marketed FOSAMAX to consumers and physicians.

106. On April 14, 1997, the FDA Division of Drug Marketing, Advertising and Communications ("DDMAC"), found that Defendant Merck's marketing of FOSAMAX was "misleading and in violation of the Federal Food, Drug, and Cosmetic Act." Specifically, the FDA found that Defendant Merck overstated its superiority in reducing fractures compared to alternative therapy Miacalcin.

107. On July 2, 1997, DDMAC found that Defendant Merck's marketing of Fosamax was misleading because its marketing of FOSAMAX to post-menopausal women "overstates the population eligible for therapy with FOSAMAX by implying that all women develop osteoporosis at menopause" and because it inappropriately stated that menopause was the single most important cause of osteoporosis.

108. On July 16, 1999, DDMAC found that specific television ads within Defendant Merck's marketing of FOSAMAX violated the Federal Food, Drug and Cosmetic Act by failing to provide information about the risks of using FOSAMAX.

109. On June 20, 2001, DDMAC found that Defendant Merck's FOSAMAX website, www.FOSAMAX. com, violated the Federal Food, Drug, and Cosmetic Act because "the web site overstates the benefits of Fosamax while minimizing the risks associated with the drug."

110. In addition to the above, Defendant Merck has repeatedly engaged in a pattern of conduct of deliberately avoiding FDA recommendations as to which warnings relating to

public hazards should be included in materials. Defendant Merck has engaged in other similar incidents with other drugs it sells and this evidence tends to show that overstating the benefits of a drug while minimizing the risk of the drug is a pattern and practice of Defendant Merck, which continues even to the present time.

111.    For instance, in March 2000, Defendant Merck completed a study called VIGOR (VIOXX Gastrointestinal Outcomes Research) relating to its prescription cox-2 inhibitor, VIOXX. The VIGOR study showed that VIOXX patients had more than double the rate of serious cardiovascular problems than those on Naproxen, an older non-steroidal anti-inflammatory drug. The study was published in the New England Journal of Medicine.

112.    In September 2001, the FDA warned Defendant Merck to stop misleading doctors about VIOXX's effect on the cardiovascular system. Defendant Merck was admonished to stop minimizing the risks of the drug in its marketing. Despite that, Defendant Merck refused to adequately warn physicians and patients about the risk of heart attacks and VIOXX.

113.    On August 25, 2004, a representative from the FDA presented results of a database analysis of 1.4 million patients. The analysis demonstrated that VIOXX users were more likely to suffer a heart attack or sudden cardiac death than those taking Celebrex or older non-steroidal drugs. The FDA representative concluded that VIOXX was linked to more than 27,000 heart attacks or sudden cardiac deaths nationwide from the time it came on the market in 1999 through 2003.

114.    On August 26, 2004, Defendant Merck released a press statement which refuted the FDA analysis and restated Defendant Merck's support for the cardiovascular safety of VIOXX.

115.    On September 30, 2004, Defendant Merck recalled VIOXX from the market, after having to halt the APPROVe study (Adenomatous Polyp Prevention on Vioxx). The study was underway to evaluate the use of VIOXX for recurrent colon polyps. The researchers found an alarming number of cardiovascular events among the drug's users in the APPROVe study.

116.    At that same time, Defendant Merck was aware that the FDA, as of August 24, 2004, was advising Defendant Merck to warn about the risk of osteonecrosis of the jaw for its FOSAMAX patients. Because Defendant Merck knew that its blockbuster drug VIOXX was about to be pulled from the market, placing more importance on the $3 billion plus annual sales of FOSAMAX, Defendant deliberately chose to not amend its packaging of FOSAMAX to include the risk of osteonecrosis of the jaw, fearing that such a warning would result in reduced revenues for its second largest income producer, FOSAMAX. Similarly, Defendant Merck failed to amend its labeling information to include information about the risks of severely suppressed bone turnover and resulting long bone fractures associated with long-term FOSAMAX use because, with the advent of the VIOXX recall, FOSAMAX had then assumed a much more important role in the Merck inventory.

117.    Defendant Merck's acts were wanton and willful or malicious in that Defendant Merck's conduct was carried on with a conscious disregard for the safety and rights of Plaintiff. Defendant Merck's unconscionable conduct thereby entitles Plaintiff to exemplary punitive damages against Defendant Merck in an amount appropriate to punish Defendant Merck, and deter similar conduct in the future.  Punitive damages are appropriate under Connecticut law.

WHEREFORE, Plaintiff demands judgment against Defendant Merck for punitive damages in addition to any and all other damages, including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety; loss of life's pleasures; loss of enjoyment of life; and loss of future earning capacity, future earnings and income, together with interest, cost of suit and counsel fees.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:

a       For general damages in an amount to be proven at the time of trial;

b.      For special damages in an amount to be proven at the time of trial;

c.      For statutory damages as set forth above, in an amount to be proven at the time of trial;

d.      For exemplary and punitive damages in an amount to be proven at the time of trial, and sufficient to punish Defendants or to deter Defendants and others from repeating the injurious conduct alleged herein;

e.      For pre judgment and post judgment interest on the above general and special damages;

f.      For costs of this suit and attorneys' fees; and

g.      All other relief that this Court deems necessary, proper, and just.

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury.

Dated: March 5, 2013

/s/    James D. Barger

JAMES DOUGLAS BARGER
New Jersey No: 03692-2010
AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ, PLLC
17 East Main Street
Suite 200
Pensacola, Florida 32502
(850) 202-1010 telephone
(850) 916-7449 facsimile
Attorneys for Plaintiff

/s/    Daniel J. Thornburgh

DANIEL J THORNBURGH
Florida No: 42661
AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ, PLLC
17 East Main Street
Suite 200
Pensacola, Florida 32502
(850) 202-1010 telephone
(850) 916-7449 facsimile
Attorneys for Plaintiff